CITY OF TENAKEE SPRINGS; Southeast Alaska Conservation Council; The Sierra Club; The Wilderness Society; et al.; The Organized Village of Kake; Kake Tribal Corporation; Angoon Community Association; Donald Frank; Eli Hanlon, Sr., Individually and as Chief of The Wooshikitaan Clan; Richard Sheakley, Sr., Individually and as Chief of the T'Addeintaan Clan; Victor Bean; Richard Bean Jr.; Ernestine Hanlon; George Westman; Douglas Glessing, Plaintiffs–Appellants,

v.

Helen CLOUGH, District Ranger, Sitka Ranger District, Tongass National Forest; Joseph A. Chiarella, District Ranger, Hoonah Ranger District, Tongass National Forest; Gary Morrison, Forest Supervisor, Chattham Area, Tongass National Forest; Ron Humphrey, Forest Supervisor, Stikine Area, Tongass National Forest; Michael A. Barton, Regional Forester, Alaska Region, et al.; Dale Robertson, in his official capacity as Chief of the United States Forest Service; Richard Lyng, in his official capacity as Secretary of Agriculture; United States Forest Service; an agency within the Department of Agriculture, Defendants–Appellees,

Alaska Pulp Corporation, an Alaska Corporation; Whitestone Logging, Inc., Defendants–Intervenors–Appellees.

Nos. 90–35516, 90–35527.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Sept. 12, 1990.

Decided Sept. 28, 1990.

James F. Clark, Robertson, Monagle, & Eastaugh, Juneau, Alaska, for intervenor Alaska Pulp.

Before WRIGHT, SCHROEDER and NORRIS, Circuit Judges.

SCHROEDER, Circuit Judge:

The City of Tenakee Springs (the City) and Native Alaskan subsistence users (Hanlon) appeal the district court's denial of their motions for preliminary injunctions. The underlying action is their consolidated challenge to the ten volume Supplemental Environmental Impact Statement (SEIS) which the United States Forest Service released in November 1989 concerning old growth timber harvesting in the Tongass National Forest in southeastern Alaska. The district court denied the injunction because it ruled that the appellants had not raised any serious legal questions or presented any likelihood of success on the merits of their claims that the Service violated requirements of the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq.* (NEPA) and § 810(a) of the Alaska National Interest Lands Conservation Act, 16 U.S.C. § 3120(a) (ANILCA).

The litigation arises out of a 50–year timber sale contract which the Forest Service and Alaska Pulp Company (APC) entered into in 1956 for logging in the Tongass National Forest. Since 1971, the Service has prepared operating plans for successive five-year periods, each supported by an environmental impact statement (EIS) as required by NEPA.

David C. Shilton, Dept. of Justice, Washington, D.C., for defendants-appellees.

Vance A. Sanders and Mark Regan, Alaska Legal Services Corp., Juneau, Alaska, and Carol H. Daniel and Joseph D. Johnson, Anchorage, Alaska, for Hanlon, appellant.

Eric P. Jorgensen, Thomas S. Waldo, Marlyn J. Twitchell, Sierra Club Legal Defense Fund, Juneau, Alaska, for Tenakee, appellant.

This dispute began with the City's challenge to the EIS for the 1981–86 operating period. In *City of Tenakee Springs v. Block,* 778 F.2d 1402 (9th Cir.1985), this court reversed the district court's denial of an earlier motion for preliminary injunction by the City. Our opinion in *Tenakee Springs* contains a discussion of the APC Contract and the need for a site specific EIS for each APC operating plan.

In a separate action, the Hanlon plaintiffs challenged, as subsistence users,[1] the EIS for the 1986–90 operating period as being in violation of section 810(a) of ANILCA, 16 U.S.C. § 3120(a). The Hanlon plaintiffs are Tlingit Indians who sustain themselves by hunting and fishing around their village of Hoonah, which lies within APC's contract area, on lands where the EIS authorized logging.

Pursuant to interim settlement agreements, the Service agreed to prepare an SEIS addressing deficiencies and concerns that had been identified during the course of the district court proceedings, as well as additional concerns raised by commentators during agency proceedings.

On November 16, 1989, the Service issued a ten-volume final SEIS for the 1981–86 and 1986–90 operating periods. For the 1986–90 period, the SEIS authorizes the Service to make available to APC for clear cut logging approximately 696 million board feet (MMBF) of old growth timber. The SEIS was divided into two phases. In Phase I, an analysis was done of the entire APC contract area to assist with the determinations that the court had found necessary. This volume of the SEIS considered, among other things, changes in land ownership, deferrals, deletion and changes of timber harvest units, the effects of ANILCA subsistence protections, and whether contractual timber commitments could be met from non-deferred areas[2]. Based on the analysis in Phase I, the Service determined that there was not a sufficient volume of timber in non-deferred areas to meet the requirements of the APC contract. The Service concluded that its contractual commitment could best be met by additional timber harvest in four selected Analysis Areas (AAs). In Phase II, a site-specific analysis was done for each of these AAs.

Both the City and Hanlon plaintiffs filed motions for preliminary injunctions. The district court consolidated the actions. On June 18, 1990, the district court denied the City's motion for a preliminary injunction. City plaintiffs timely appealed. On July 10, 1990, the district court denied the Hanlon motion for a preliminary injunction. The Hanlon plaintiffs also timely appealed. We consolidated the appeals and granted an injunction pending appeal which enjoined further roadbuilding and timber harvesting in the value comparison units (VCUs) most important to appellants' concerns, but permitted logging and roadbuilding operations to go forward in less sensitive areas. Additionally, we agreed to consider this appeal on an expedited basis.

## Consideration of Alternatives

■ Both NEPA and ANILCA require the Service to consider reasonable alternatives to a proposed action. The NEPA provisions and underlying regulations are designed to insure careful study of the environmental impact of government action. The relevant provisions of ANILCA are intended to minimize the impact of a proposed project on resources which rural village residents of Alaska use for subsistence.

NEPA requires that an agency "[r]igorously explore and objectively evaluate all reasonable alternatives" to a proposed action. 40 C.F.R. § 1502.14(a) (1989); *see* 42 U.S.C. § 4332(2)(C)(iii), (2)(E). The Act also requires a "detailed statement," 42 U.S.C. § 4332(2)(C), "sufficient 'to give decision makers ... removed from the initial decision sufficient data from which to draw their own conclusions.'" *City of Tenakee Springs,* 778 F.2d at 1407 (citation omitted).

---

**1.** 16 U.S.C. § 3113 states, in pertinent part:

... the term "subsistence uses" means the customary and traditional uses by rural Alaska residents of wild, renewable resources for direct personal or family consumption as food, shelter, fuel, clothing, tools, or transportation; for the making and selling of handicraft articles out of nonedible byproducts of fish and wildlife resources taken for personal

or family consumption; for barter, or sharing for personal or family consumption; and for customary trade....

**2.** "Non-deferred areas" refers to value comparison units (VCUs) that were not closed to further road construction and/or timbering operations pending completion of the SEIS under the settlements in this case.

The policy statement contained in ANILCA tells us that public lands in Alaska are to be utilized in a manner which will "cause the least adverse impact possible on rural residents who depend upon subsistence uses of the resources of such lands...." 16 U.S.C. § 3112(1).

The proposed action under review in the ten volume SEIS authorizes the Service to make available to APC approximately 696 MMBF of timber in four selected AAs for the 1986–90 operating period. Because APC has cut an average of 85 MMBF in each of the first four years of this five-year period, the SEIS in effect makes available more than 350 MMBF for the period from November 1989 through December 1990. The SEIS does not seriously consider any alternatives which would alter this proposed result.

According to the Service, it could not have properly considered any alternative which would have resulted in less timber being made available, because the terms of its contract with APC require this volume. It thus asks us to hold that the provisions of a contract originally entered into in 1956 preempt subsequent Congressional enactments designed to prevent both environmental damage and injury to subsistence resources in Alaska. We believe that the appellants raise serious legal questions regarding the soundness of the government's position.

First, it is not at all clear that the contract requires the government to make available to APC hundreds of millions more board feet than it could possibly cut during the five-year period. The contract originally provided in 7a(2)(d) that:

> The total timber volume available for designation for cutting on the areas selected for any five year period shall not be less than 800,000,000 board feet nor more than 1,200,000,000 board feet.

In 1985 the parties modified the contract for the 1986–90 operating period.

> For the 1986–90 operating period, the Forest Service shall not be required to appraise more than 700 MMBF of timber under section 2(d)(2)
>
> ....

The government maintains that the amendment requires it to offer 700 MMBF during the five year period and allows for no significant variation. Moreover, the government contends that the contract requires that every tree making up this volume be available to APC for cutting by December 31, 1990—even though not necessarily harvested by that date. According to the Service, such availability was required because the carryover provisions of the contract provide for a "transition" from one five year period to the next. Because of this "availability constraint," the Service determined that concentrated harvest in these four areas was necessary to achieve its goal of compliance with the terms of its contract with APC.

Appellants contend that the Service misinterpreted its contract with APC as requiring it to make 700 MMBF available for the 1986–90 operating period. They argue that the language means that 700 MMBF was the ceiling. Therefore, the contract permitted the government to offer less volume, particularly if it were apparent that APC could not make use of the full 700 MMBF during the relevant period. If the appellants are correct, then the contract terms did not serve as an "availability constraint" requiring the Service to concentrate logging in the four AAs at issue, and the Service erred in refusing to consider alternatives that would have involved cutting less timber over a broader area, with less harm to environmental and subsistence interests. The appellants' interpretation of the language of the contract is not unreasonable. There is at least a serious question as to its proper interpretation.

Indeed, the amount by which the proposed offering exceeds the capacity of APC to cut is so large that the proposed action appears to go beyond any intended "transition" period and suggests the possibility of a *de facto* extension of the contract beyond the limits of its 50-year duration. Thus, the government's reliance on the carryover provisions of the contract does not lend significant support to its position that the parties in 1985 agreed that the government would make available 700 MMBF regard-

less of the amount APC would be able to harvest.

Even if the contract terms did in fact contemplate making available the full 700 MMBF, the SEIS does not explain why an amendment to the contract was not feasible. Forest Service regulations allow it to cancel any contract that "would result in serious environmental degradation or resource damage" so long as reasonable compensation is paid. 36 C.F.R. § 223.116(a)(5) (1989). The Service also has the authority to modify a contract in similar circumstances. 36 C.F.R. § 223.113 (1989). This particular contract has been amended eleven times in the course of its history, and the Service has not explained why it could not be amended further.

The district court found that the plaintiffs had shown a likelihood of success on the merits of their claim that the SEIS contained an inadequate discussion of the "no action alternative" required by NEPA.[3] See 40 C.F.R. §§ 1502.14(d), 1508.25(b)(1) (1989). However, the district court declined to issue an injunction because it found that defect to be a "merely technical" deficiency which did not implicate plaintiffs' environmental or subsistence interests. We find, however, that the Service's failure even to discuss, much less evaluate, the consequences of terminating, suspending or amending its contract necessarily implicates the environmental and subsistence interests of plaintiffs. We believe as well that the Service's failure seriously to consider any alternative to the rigid application of its own interpretation of the contract requirements raises serious questions of compliance with applicable law. Therefore, the district court's conclusion that plaintiffs failed to show a likelihood of success on the merits of this claim was wrong as a matter of law.

*The Failure to Address Cumulative Impact of Past, Present and Future Logging Over the Entire Contract Area*

■ Appellants contend that the SEIS is inadequate because it does not include a

comprehensive analysis of cumulative impact on the environment as required by NEPA and ANILCA. Appellants argue that the Service has created a false impression of cumulative impact by disaggregating the analysis to an area by area study, considering only the effects of this proposed action in isolation both from action contemplated elsewhere in the contract area and over future contract years.

■ NEPA requires that where several actions have a cumulative or synergistic environmental effect, this consequence must be considered in an EIS. *Sierra Club v. Penfold,* 857 F.2d 1307, 1320–21 (9th Cir.1988) (citations omitted). A cumulative impact is the impact on the environment that results from "the incremental impact of the action when added to the other past, present and reasonably foreseeable future actions...." 40 C.F.R. § 1508.7 (1989).

■ Where there are large scale plans for regional development, NEPA requires both a programmatic and site-specific EIS. *See City of Tenakee Springs,* 778 F.2d at 1407 (citations omitted). This court has held that where several foreseeable similar projects in a geographical region have a cumulative impact, they should be evaluated in a single EIS. *See LaFlamme v. Federal Energy Regulatory Commission,* 852 F.2d 389, 401–02 (9th Cir.1988). There, emphasizing the likelihood of future development, the court remanded to the agency for further consideration of cumulative impact because the agency had examined single projects in isolation without considering the net impact that all the projects in the area might have on the environment. *See LaFlamme,* 852 F.2d at 401–03.

■ ANILCA similarly requires that where a proposed action is related to other actions which produce significant cumulative impact, these effects must be addressed in the EIS. *See Penfold,* 857 F.2d at 1321. In section 810, ANILCA directs the Forest Service to:

---

**3.** The "no action alternative" would in this case mean the suspension of harvesting within the

entire sale area.

[E]valuate the effect of [its program] on subsistence uses and needs, the availability of other lands for the purposes sought to be achieved, and other alternatives which would reduce or eliminate the use, occupancy, or disposition of public lands needed for subsistence purposes....

16 U.S.C. § 3120(a). These independent findings are then to be included in any EIS prepared in connection with the project. 16 U.S.C. § 3120(b).

The Service contends that the cumulative impact of timber harvesting was considered in the Tongass Land Management Plan EIS (TLMP) of 1979 and in the 1981–86 operating plan EIS. Yet these documents could not have contained any analysis of the cumulative impact on subsistence within the requirements of ANILCA, since they were both drafted before ANILCA became effective.

Insofar as the TLMP relates to NEPA, it is a programmatic EIS providing management direction and general guidelines. *See City of Tenakee Springs*, 778 F.2d at 1406. It is not site-specific. We are cited to no provision of the TLMP that contains any cumulative environmental impact analysis of timber harvest operating plans scheduled for implementation over the life of the contract within the Tongass National Forest.

■ The Service suggests that the cumulative impact of its proposed action will be addressed in the upcoming revision of the TLMP. NEPA, however, directs agencies to include in every recommendation, report or proposal for legislation and other major federal actions significantly affecting the quality of the human environment, a detailed statement on:

(i) the environmental impact of the proposed action;

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented;

(iii) alternatives to the proposed action;

(iv) the relationship between local short term uses of man's environment and the maintenance and enhancement of long-term productivity; and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

42 U.S.C. § 4332(2)(C). Thus, NEPA requires consideration of the potential impact of an action *before* the action takes place.

■ Moreover, while the documents on which the government relies do not appear to make any reference to future actions, announcements have already been made for new sales in the coming year. The Service has published three notices of intent in the Federal Register since the SEIS was released. These would make available 280 MMBF of timber over the next two years within five different AAs in the Tongass Forest. Because the next operating period begins as of December 31, 1990, APC will presumably be cutting simultaneously in more than the four AAs covered in the SEIS at issue here. The effects of such reasonably foreseeable future cutting should have been analyzed in connection with the proposed cutting at issue in this SEIS.

For these reasons, the district court's conclusion that appellants have failed to meet their burden of showing that the cumulative impact analysis was inadequate appears to be erroneous as a matter of law. At the very least, the appellants have raised serious questions concerning the adequacy of the EIS with regard to cumulative impact analysis required by both NEPA and ANILCA.

## CONCLUSION

Because the district court found that the plaintiffs had failed to demonstrate any likelihood of success on the merits, the questions before us are primarily legal ones which we review de novo. *City of Tenakee Springs*, 778 F.2d at 1404. We are required to vacate the district court's denial of the injunction and remand for further consideration in the event that we find that the plaintiffs did indeed raise serious questions on their claims. We have reviewed the extensive materials filed by all parties and conclude that the plaintiffs have raised serious issues which should be

considered by the district court on the merits. We have summarized the most significant of these in this opinion.

This court has entered a narrowly tailored injunction pending appeal designed to permit APC to continue logging at an undiminished level in various areas while preserving the areas most necessary to plaintiffs' subsistence and environmental needs. The environmental consequences on the old growth forest in the enjoined areas, were they to be opened up in a manner contemplated by the proposed action, would be irreversible for the foreseeable future. The impact on resources necessary for the long term subsistence needs of the plaintiffs would similarly be irreversible, as well as potentially devastating to the Hanlon plaintiffs. On the other hand, the adverse impact of this injunction on the government and intervenor appears to be negligible. For instance, in challenging the injunction now in place, APC as intervenor acknowledges that it is not suffering economic losses but is instead relying upon the assertion that some residents of Hoonah not party to this litigation will lose their jobs. In weighing the balance of hardships among the parties in this case, we therefore must find that they tip sharply in favor of the appellants.

Accordingly, we reverse the district court's denial of the preliminary injunction. The case is remanded to the district court for further proceedings. The injunction issued by this court's order of July 18, 1990 (as modified July 27, 1990) shall remain in effect pending the district court's consideration of the merits of plaintiffs' claims. The injunction is, of course, subject to modification by the district court upon application of the parties in the event of changed circumstances, and appeal from any such modifications will lie to this court. *See* 28 U.S.C. § 1292(a)(1).[4]

REVERSED AND REMANDED.

---

4. APC has requested that appellants be required to post a bond should this court require an injunction to issue. That request is denied.