960 F.2d 776
 22 Envtl. L. Rep. 20,817
 CITY OF TENAKEE SPRINGS, et al., Plaintiffs-Appellants,
v.
James FRANZEL, et al., Defendants,
and
F. Dale Robertson, et al., Defendants-Appellees,
and
Alaska Pulp Corporation (APC), et al.,
Defendants-Intervenors-Appellees.
Sam HANLON, Sr., et al., Plaintiffs-Appellants,
v.
Michael BARTON, Defendant,
and
Dale Robertson, et al., Defendants-Appellees,
and
Alaska Pulp Corporation, Defendant-Intervenor-Appellee.
 Nos. 91-35520, 91-35522.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Aug. 28, 1991.
Decided Feb. 12, 1992.
As Amended April 9, 1992.
As Amended on Denial of Rehearing
and Rehearing En Banc
June 2, 1992.
 
 Thomas S. Waldo, Sierra Club Legal Defense Fund, Juneau, Alaska, for plaintiffs-appellants.
 Vance Sanders, Alaska Legal Services Corp., Juneau, Alaska, for plaintiff-appellant Hanlon.
 David Shilton, U.S. Dept. of Justice, Washington, D.C. for defendants-appellees Robertson.
 James F. Clark, Robertson, Monagle & Eastaugh, Juneau, Alaska, for defendants-intervenors-appellees Alaska Pulp Corporation.
 John G. Gissberg, Deputy Atty. Gen., Juneau, Alaska, for amicus curiae State of Alaska.
 Appeal from the United States District Court for the District of Alaska.
 Before: WRIGHT, SCHROEDER and NORRIS, Circuit Judges.
 SCHROEDER, Circuit Judge:
 
 
 1
 The City of Tenakee Springs and native Alaskan subsistence users appeal the district court's grant of summary judgment in favor of the government and denial of permanent injunctive relief. The underlying action is appellants' challenge to the 10-volume Supplemental Environmental Impact Statement (SEIS) released by the U.S. Forest Service in November 1989 concerning timber harvest in the Alaska Pulp Company's (APC) contract sale area in the Tongass National Forest in southeastern Alaska.
 
 
 2
 The litigation arises out of the 50-year timber sale contract which the Forest Service and APC entered into in 1956 for logging in the Tongass National Forest. Since 1971, the Service has prepared operating plans for successive five-year periods, each supported by an environmental impact statement (EIS) as required by the National Environmental Policy Act, 42 U.S.C. § 4321 et seq. (NEPA).
 
 
 3
 We have seen this matter twice before. This dispute began with the City's challenge to the EIS for the 1981-86 operating period. In City of Tenakee Springs v. Block, 778 F.2d 1402 (9th Cir.1985) (Tenakee I ), this court reversed the district court's denial of the city's motion for a preliminary injunction. Our opinion in Tenakee I contains a discussion of the APC contract and the need for a site specific EIS for each operating plan. Last year, in City of Tenakee Springs v. Clough, 915 F.2d 1308 (9th Cir.1990) (Tenakee II ), this court reversed the district court's denial of the City and Hanlon's motion for a preliminary injunction in their challenge to the 1989 SEIS prepared for the 1981-1986 and 1986-1990 operating periods. Our opinion in Tenakee II contains a discussion of the factual and procedural background leading to that point in the litigation. We found that appellants had raised several serious legal questions concerning the adequacy of the SEIS's cumulative impact analysis and the range of alternatives considered. Accordingly, we remanded for further proceedings and ordered that the injunction entered by this court pending appeal continue during the district court's consideration of the merits of plaintiffs' claims.
 
 
 4
 After hearing further evidence, the district court subsequently denied the City and Hanlon's motion for summary judgment, granted the Service's motion for summary judgment, and vacated the preliminary injunction. The City and Hanlon timely appealed. On June 4, 1991, the district court entered a 10-day injunction pending appeal so that appellants could request such relief from this court. After extensive briefing and oral argument, we continued the injunction pending appeal, as modified to allow APC access to an additional 44 metric million board feet (MMBF) of timber.
 
 
 5
 We now deal with whether to affirm or reverse the district court's denial of a permanent injunction. The question on the merits up to now has been whether the Forest Service complied with environmental laws when it prepared the SEIS in 1989 to assess the environmental effects of compliance with the contract as then written. Assuming the answer to that question is no, the controlling question becomes whether the equities flowing from an inadequately prepared 1989 SEIS warrant imposition of permanent injunctive relief today. We conclude the answer to this question is also no.
 
 
 6
 Our conclusion is based on the fact that there has been significant intervening legislation since we issued our 1984 and 1990 opinions ordering preliminary injunctive relief in Tenakee I and II. In November 1990, Congress passed the Tongass Timber Reform Act ("TTRA"). Pub.L. No. 101-626, 104 Stat. 4426-4435 (Nov. 28, 1990). In doing so, Congress took a hard look at many of the concerns we ourselves expressed about this long-term contract in Tenakee II. 915 F.2d at 1311-12.
 
 
 7
 In Tenakee II we were concerned about the government's refusal to consider the environmental effects of harvesting the totality of the contract requirements, its refusal to consider any modification of the contract requirements, and its lack of attention to the cumulative impact this totality of harvest would have on subsistence users pursuant to section 810(a) of the Alaska National Interest Lands Conservation Act, 16 U.S.C. § 3120(a) (ANILCA). Id. at 1311-13. With the passage of the TTRA, however, many of our concerns have been addressed. Congress has reduced the volume to be harvested, expanded the non-harvestable wilderness areas, and has ordered the government to prepare an extensive study of the environmental effects of the contract requirements in order to better determine whether and how further to modify the contract. See e.g. Pub.L. No. 101-626, § 301, § 508, § 202, 104 Stat. 4428-4432.
 
 
 8
 Moreover, the methodology for ensuring future compliance with environmental laws has been changed. The TTRA provides that subsequent cutting will be pursuant to the requirements now imposed for environmental study of individual sales rather than on the basis of the five-year plans the law required in 1989. See Pub.L. No. 101-626, § 301(c), 104 Stat. 4430-4431. These modifications, combined with the Act's requirement that the Secretary of Agriculture assess whether the government can both comply with the provisions of applicable environmental laws and meet the contract volume requirements, cause us to conclude that the long-term cumulative carryover effects we feared would result from the five-year allocation methodology we confronted in Tenakee II have been eliminated.
 
 
 9
 Congress enacted the TTRA in an effort to remedy the conflicts inherent in the Forest Service's dual role as party to the disputed contracts and as the agency charged with managing the competing uses within the contract area. The TTRA mandates that the Forest Service must plan in a way that will fulfill both its contractual commitments and its statutorily mandated environmental commitments, not one at the expense of the other. Specifically, Congress has replaced the contract driven planning process underlying the SEIS at issue here, with a new methodology designed to ensure that timber sale planning within the Tongass pursuant to APC's long term contract will comply with all applicable environmental laws and standards.
 
 
 10
 Thus, with the passage of the TTRA in November 1990, there is no longer the same threat of irreparable harm resulting from the long-term carryover effects of logging carried out pursuant to the procedurally suspect, contract driven, 1989 SEIS. Any such threat has been dissipated through Congress' decisions to step in to conduct its own study, to modify the contract and to mandate further intensive agency review. Accordingly, although perceived procedural deficiencies in the SEIS at issue caused us to pause and remand this matter to the district court for further proceedings in Tenakee II, these same inadequacies have now been addressed by Congress and so, will not support the imposition of permanent injunctive relief today. See Amoco Production Co. v. Gambell, 480 U.S. 531, 542, 107 S.Ct. 1396, 1402, 94 L.Ed.2d 542 (1987) citing (Weinberger v. Romero-Barcelo, 456 U.S. 305, 313, 102 S.Ct. 1798, 1803, 72 L.Ed.2d 91 (1982) (no mechanical obligation to grant an injunction for every violation of law)).
 
 
 11
 Under these circumstances, we have no need to address the merits of appellants' claims that the 1989 SEIS was inadequate when prepared. There would be little or no purpose served in requiring the Forest Service to redo the 1989 SEIS in order to consider the very issues Congress itself considered in enacting the TTRA. Plaintiffs are no doubt carefully monitoring the Forest Service's compliance with the TTRA and are capable of filing new suits based upon intervening circumstances. The Forest Service's management of this forest also remains subject to the requirements of NEPA, the Alaska Natural Interest Lands Conservation Act (ANILCA) 16 U.S.C. § 3120, and the other applicable environmental laws in effect prior to the enactment of the TTRA. Failure to comply with the newly-enacted requirements of the TTRA, like any violation of a statute, could support injunctive relief in the future if the equities otherwise favor such relief.
 
 
 12
 For these reasons, the judgment of the district court denying permanent injunctive relief is AFFIRMED. Each party shall bear its own costs on appeal.
 
 WILLIAM A. NORRIS, Circuit Judge, dissenting:
 
 13
 As the majority points out, this is not the first time we have seen this case. In City of Tenakee Springs v. Clough, 915 F.2d 1308 (9th Cir.1990) (Tenakee II ), we held that plaintiffs were entitled to a preliminary injunction because they had demonstrated the possibility of irreparable harm and the likelihood that they would succeed on the merits. Today, the majority holds that we need not reach the merits because the equities do not favor permanent injunctive relief. I disagree. It is sometimes said of judges that we cannot see the forest for the trees. In this case, it is the trees that the majority overlooks by focusing improperly on the forest as a whole.
 
 
 14
 The majority's decision rests entirely on Congress' enactment in 1990 of the Tongass Timber Reform Act ("TTRA"). In considering the equities, however, the majority errs by confusing the effect of the TTRA on the entire Tongass National Forest with the effect of the TTRA on the particular tracts of land that are the subject of this lawsuit. The majority notes that the TTRA will reduce the volume of timber to be harvested, expand wilderness areas, and commission a study of environmental effects. However, none of these changes will affect the land currently designated for logging under the 1989 Supplemental Environmental Impact Statement ("SEIS").
 
 
 15
 The majority also notes that the TTRA will prevent long-term carryovers in the future. However, the same provision that bars future carryovers will force the Alaska Pulp Corporation ("APC") to harvest all timber currently designated under the allegedly inadequate SEIS within three years if it hopes to receive further offerings of timber. TTRA § 301(c)(3). The one major effect the TTRA will have on the particular tracts at issue here is to ensure that a large number of the trees on them will be logged in a relatively short period of time. If anything, this tips the equities in favor of the plaintiffs and makes it even more important that we address their claims on the merits.
 
 
 16
 We discussed plaintiffs' claims at length in Tenakee II. The 1989 SEIS authorizes the Forest Service to make available 696 metric million board feet (MMBF) for the 1986-90 operating period. However, because APC harvested an average of only 85 MMBF in each of the first four years, the SEIS in effect made available more than 350 MMBF for the period November 1989 through December 1990. Tenakee II, 915 F.2d at 1311.
 
 
 17
 Plaintiffs contend that the Forest Service did not consider reasonable alternatives to making such a large amount of timber available in a single year. Indeed, they argue that the government's contract with APC did not require the government to offer 700 MMBF during the 1986-90 period. In Tenakee II, we expressed our view that plaintiffs' "interpretation of the language of the contract is not unreasonable." 915 F.2d at 1311. "[I]t is not at all clear," we said, "that the contract requires the government to make available to APC hundreds of millions more board feet than it could possibly cut during the five-year period." Id.
 
 
 18
 Even if the contract with APC does require that 700 MMBF be made available during the 1986-90 period, plaintiffs argue that the Forest Service should have considered cancelling or modifying the contract. We noted in Tenakee II that the Forest Service's regulations permit it to cancel or modify a contract where it would result in serious environmental degradation or resource damage. Id. at 1312. The SEIS failed to consider not only this alternative but also the alternative of modifying the contract by congressional enactment. "[T]he fact that an alternative requires legislative action does not automatically justify excluding it from an EIS." City of Angoon v. Hodel, 803 F.2d 1016, 1021 (9th Cir.1986), cert. denied, 484 U.S. 870, 108 S.Ct. 197, 98 L.Ed.2d 148 (1987).
 
 
 19
 Plaintiffs also contend that the 1989 SEIS is deficient because it fails to consider cumulative impacts adequately. The SEIS considers the impact of logging on environmental and subsistence uses in each of four Analysis Areas ("AA's") but does not consider the cumulative impact of logging in all four areas. To give one example, the Village of Hoonah is divided between two AA's. One part of the SEIS addresses the impact on Hoonah of losing 214 deer because of logging in one AA. Another part of the SEIS addresses the impact on Hoonah of losing 190 deer because of logging in a second AA. Nowhere, however, does the SEIS consider the cumulative impact on Hoonah of losing 404 deer. We noted in Tenakee II that plaintiffs had "raised serious questions concerning the adequacy of the EIS with regard to cumulative impact analysis required by both NEPA and ANILCA." 915 F.2d at 1313.
 
 
 20
 The majority claims that the inadequacies of the 1989 SEIS were addressed by Congress in passing the TTRA. However, nothing in the TTRA or its legislative history supports the assumption that Congress intended to validate retroactively the 1989 SEIS or exempt it from complying with NEPA and ANILCA.
 
 
 21
 I respectfully dissent.