B. FLETCHER, Circuit Judge,
dissenting:
I respectfully dissent. Although I concur in Part II.C of the majority opinion, I cannot agree with the majority that the federal agencies acted neither arbitrarily nor capriciously when approving the Smoky Canyon Mine expansion project. The majority violates both the letter and the spirit of the applicable federal environmental standards by approving agency action despite currently lacking critical information and by deferring key evaluations to some unspecified future date.
I
To understand fully what is at issue in this case, it is necessary to focus on two key facts. First, in 2003, the Environmental Protection Agency, U.S. Forest Service, and Idaho Department of Environmental Quality signed an Administrative Order on Consent pursuant to the Comprehensive Environmental Compensation Liability Act (CERCLA) with the J.R. Simplot Company (“Simplot”). This order required Simplot to undertake a set of “removal response actions” to clean up selenium pollution the company’s mining activities had caused in and around the Smoky Canyon Mine. There is no evidence, however, that Simplot has complied with its obligation to develop and implement a comprehensive clean-up plan for pollution stemming from existing mine panels A, B, C, and D. In fact, Simplot has only identified some of the sources of extant selenium pollution caused by its mining activities in Smoky Canyon.
Second, Simplot is at the helm of an industry that contributes millions of dollars annually to the economy of southeastern Idaho and western Wyoming. Simplot’s Smoky Canyon Mine in eastern Idaho provides phosphate ore through a slurry line to a manufacturing facility *1154 known as the Don Plant in Pocatello, Idaho. The claim is that, if the Smoky Canyon Mine expansion project were halted, the Don Plant would face closure. As evident from the myriad intervenors in this law suit, significant economic interests oppose this outcome.
For example, according to the United Steelworkers Local 632, the union which represents more than 250 employees at the Don Plant, that facility provides over $33 million in wages, salaries, and benefits for residents of four counties. The Don Plant is thus a key source of employment in an area where many residents lack post-high school educations and where unemployment is chronic. Roger Chase, a former Simplot employee who served as the may- or of Pocatello from 2002 through 2009, estimated that Simplot jobs paid twenty to thirty percent more than other new jobs available in Pocatello. Chase also testified that Simplot “provides substantial benefits to the City of Pocatello,” including funding for Idaho State University. The Idaho Farm Bureau Federation has warned that the closure of the Don Plant would adversely affect Idaho farmers’ farming costs and overall standards of living. County commissioners for communities adjacent to the Don Plant estimated that the closure of either the mine or the plant would result in the loss of millions of dollars in tax revenues, jeopardizing local school district budgets and other social services in the region.
II
Against this backdrop, Simplot applied to the Bureau of Land Management (“BLM”) and the U.S. Forest Service (collectively, “the agencies”) for permission to expand the Smoky Canyon Mine into two new panels, F and G. The expansion would extend the life of the mine, and of the Don Plant, by fourteen to sixteen years. On the record before us, I cannot agree with the majority that the agencies did not act arbitrarily or capriciously in approving the mine expansion project, in violation of the Clean Water Act (“CWA”), National Forest Management Act (“NFMA”), and the National Environmental Policy Act (“NEPA”). Rather, I would hold that the agencies violated these federal laws in three distinct ways: (1) by authorizing the expansion project on the basis of admittedly incomplete information regarding sources of extant selenium pollution, without any indication that the missing information could not reasonably be obtained; (2) by relying on the results of concededly inadequate modeling to predict the water quality impacts of the expansion project; and (3) by adopting what amounts to a “test while mining” scheme, relying on post-decisional modeling rather than additional modeling prior to project approval to evaluate the expanded mine’s environmental impacts.
A
Under the CWA, states are required to compile a list of water bodies, called a § 303(d) list, that do not achieve applicable water quality standards. See 33 U.S.C. § 1313(d). The Final Environmental Impact Statement (“FEIS”) for the mine expansion project referenced the 2002 list, which encompassed twenty-four miles of streams considered impaired by selenium. The impaired water bodies include South Fork Sage Creek, Pole Canyon Creek, and various other tributaries to Sage Creek. The record nowhere reveals what kind of remediation has been undertaken.
In evaluating the mine expansion project, the agencies determined that remediation at just two known sources of selenium pollution, Pole Canyon and Panel E, would suffice to offset future pollution caused from additional mining. This determination was critical for the agencies’ authorization of the mine expansion pro *1155 ject, which was premised in part on the assumption that the successful remediation of these sites would be sufficient to offset additional selenium discharges associated with new mining activities without pushing the total selenium levels over legal limits.
The majority contends that the agencies’ decision that the remediation of Pole Canyon and Panel E would adequately offset future mine-related pollution is rational, and accepts the agencies’ conclusion that these areas are the major sources of existing selenium pollution. Maj. Op. at 1146-47, 1149. The record, however, belies these conclusions, and indicates that Pole Canyon and Panel E are but two of the known sources of existing selenium pollution.
In choosing to focus on Pole Canyon and Panel E, the Forest Service and BLM relied on a contractor employed by Simplot to assess these sites. It concluded that the sites were exclusively responsible for the selenium contamination in Hoopes Spring and South Fork Sage Creek Spring. The agencies acknowledged, however, that the contractor’s conclusion was but “one possible interpretation” of the limited available data, and further that “additional investigation” would be required to determine all the “source(s)” of existing selenium contamination in the area. Indeed, the record before the agencies at the time of their determination mentioned selenium contributions from at least two other sources: Panel A and Panel D. Yet these sources were not included in the proposed remediation plan.
When agencies evaluate “reasonably foreseeable significant adverse effects on the human environment in an environmental impact statement,” and incomplete information “is essential to a reasoned choice among alternatives and the overall costs of obtaining it are not exorbitant,” NEPA requires that that information be obtained and included in the EIS. See 40 C.F.R. §§ 1502.22, 1502.22(a). It is undeniable that the missing information at issue here — the extent of existing selenium pollution at the site of a proposed mine expansion project — “is essential to a reasoned choice among alternatives.” Id. Although the agencies acknowledged the need for “further investigation” before all sources of selenium contamination at Smoky Canyon could be identified, there is no indication on the record before this court that the costs of such investigation would be exorbitant. The agencies’ failure to obtain and include a comprehensive list of the sources of selenium contamination at Smoky Canyon, therefore, violates federal law. This failing is particularly egregious given that Simplot’s mining operations at Smoky Canyon have been subject to CERCLA response actions for over seven years.
The majority holds that, since NEPA “only mandates an evaluation of a proposed plan’s future environmental impact,” further investigation of existing pollution was not required. Maj. Op. at 1151. This is error. Under the circumstances of this case, any meaningful evaluation of the mine expansion project’s future environmental impacts requires a thorough understanding of existing pollution in the project area. Put differently, because Simplot’s prior mining activities have so polluted Smoky Canyon, additional mining will necessarily exacerbate pollution in violation of state and federal environmental standards unless significant remediation is completed before any new mining occurs. A comprehensive understanding of existing pollution on site is a prerequisite to any determination of where remediation efforts should begin.
Given the foregoing, the agencies’ conclusion that the remediation of Pole Canyon and Panel E will be sufficient to offset future pollution from the Smoky Canyon *1156 Mine expansion project is hardly a rational conclusion. Motor Vehicle Mfrs. Ass’n of U.S. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (To avoid making an arbitrary and capricious determination, agencies “must examine the relevant data and articulate a satisfactory explanation for [their] action including a ‘rational connection between the facts found and the choice made.’ ” (quoting Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962)); see also Port of Seattle v. FERC, 499 F.3d 1016, 1035 (9th Cir.2007), cert. denied, 130 S.Ct. 1051 (2010)).
B
As the majority notes, one of the experts who participated in the environmental review process was Dr. Christopher Carlson, the Forest Service’s National Ground Water Program Leader. In a detailed memorandum written in January 2007, Dr. Carlson analyzed the proposed cover system for Panels F and G. Dr. Carlson observed that “as the modeling effort progressed, [Simplot’s] contractor had substantial difficulty getting the selected model to execute appropriately,” leading it to “implement a number of short cuts and approximations in the analyses.... ” These shortcuts “resulted in a cover evaluation process that did not fully characterize or evaluate the expected cover performance, design options, modeling assumptions and input uncertainty, or the overall uncertainty in the predictions.” This led Dr. Carlson to conclude, on the basis of his extensive expertise in such matters, that “both the agencies and public are left with a limited understanding of the expected operation of the cover system, its critical design features, and the key expected stressors.”
More specifically, Dr. Carlson noted that since the cover would be set “at an elevation of about 7500 [feet] in the northern tier of the country, the primary environmental forcings that the cover will be expected to handle while limiting infiltration are seasonal in nature (e.g., freeze-thaw, snowmelt, wetting-drying, evapotranspiration).” In other words, an absolutely central question regarding the ability of the proposed cover to function as intended involved the cover’s capacity to respond to seasonal variations.
Yet, as Dr. Carlson noted, “the short cuts taken to speed the [modeling] process” led to an evaluation of model output on only an average annual basis. Of the 33 inches of precipitation received each year in the area, however, approximately 22 inches — or two thirds — are associated with the spring snowmelt. A major seasonal surge is thus predictable, and relevant to the cover’s actual functioning capability. The modeling completed did not account for any such surges. This critical shortcoming prompted Dr. Carlson to conclude “that the lack of seasonal information, when the snowmelt dominated hydrology of the area would be most extreme, limits reviewers’ ability to fully characterize the expected conditions and develop a complete understanding of the processes likely to be important for both near-term and long-term cover performance.” (emphasis added) Dr. Carlson’s objections were a reiteration of concerns he had expressed in October 2006, when he warned that an evaluation of the proposed cover design that was based “purely on an annual average basis when we know there are significant seasonal aspects to the hydrological cycle should not be acceptable.”
Rather than confront and address these fundamental inadequacies in the modeling completed, and instead of ordering additional modeling to obtain the seasonal information which the Forest Service’s own groundwater expert had deemed critical, the agencies simply concluded that “there *1157 is sufficient information to implement the store and release cover system developed,” and that “[n]o further cover modeling efforts are needed.”
The majority accepts this conclusion on the basis of the agencies’ contention that “the annual output would remain the same even if [the] entire 0.7 inches [of water percolating through the cover annually] seeped through during the peak flow months.” Maj. Op. at 1147-48. Yet there is no evidence in the record before this court that the proposed cover design could handle such seasonal fluctuations, or what would happen if all or even most of the annual output seeped through the cover in a few short weeks in the spring.[1] Indeed, the agencies’ technical review team admitted that the lack of monthly output analysis “led to uncertainty within [the team] about the short term accuracy” of the modeling results.[2]
This is, therefore, not a case involving reasonable scientific disagreements among qualified experts. Cf. Marsh v. Or. Natural Res. Council, 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). Rather, this is a case in which the agency’s expert raised substantial uncertainties that were supported by scientific authority, and which the agencies entirely failed to address in the FEIS. Under NEPA, “federal agencies must specifically discuss at appropriate points in the final [EIS] any responsible opposing view which was not adequately addressed in the draft [EIS] and ... indicate the [agencies]’s response to the issues raised. A failure to do so is itself a NEPA violation.” WildWest Inst. v. Bull, 547 F.3d 1162, 1171 (9th Cir.2008) (citing 40 C.F.R. § 1502.9(b)) (alterations in original; quotation marks omitted).
Rather than address Dr. Carlson’s measured analysis, the defendants make every effort to minimize or discredit the import of his opinions, a lead the majority willingly follows. But Dr. Carlson is not just one person on a larger team of experts. He is the leader of the U.S. Forest Service’s National Ground Water Program, and, as such, has deep expertise on the water pollution problems that lie at the very heart of the mine expansion project. Moreover, the additional modeling necessary to ascertain the seasonal viability of the proposed cover design could, by all accounts, have been completed in as little as four to ten days. The defendants’ dismissive attitude, therefore, may reflect little more than uncertainty as to what might surface if additional studies or investigation had been completed. The court should not endorse such an aversion to finding out the truth.
The majority emphasizes that all the experts involved “agreed that the model effectively accounted for seasonal variation in the long-term.” Maj. Op. at 1150. This is an overstatement; there is no indication that Dr. Carlson ever found that the modeling completed was effective in any respect. Even assuming that the majority’s characterization is accurate, however, it is irrelevant to the questions raised on this appeal and to the court’s role in evaluating the adequacy of agency action. Even if the model effectively accounted for season *1158 al variation in the long-term, this alone is insufficient, because the mine expansion project will, at most, extend the life of the Smoky Canyon Mine for fourteen to sixteen years. The agencies’ conclusions, and the majority’s opinion, leave open the possibility that significant environmental pollution will occur at the Smoky Canyon Mine in the near term. If this is not “fail[ure] to consider an important aspect of the problem,” what is? Motor Vehicle Mfrs. Ass’n, 463 U.S. at 43, 103 S.Ct. 2856.
C
NEPA’s “look before you leap” requirements dictate that agencies “consider every significant aspect of the environmental impact of a proposed action” before that action is approved. Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Engineers, 524 F.3d 938, 947(9th Cir.2008) (quoting Baltimore Gas & Elec. Co. v. Natural Res. Defense Council, Inc., 462 U.S. 87, 97, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983)). It is not appropriate or acceptable “to defer consideration of cumulative impacts to a future date. ‘NEPA requires consideration of the potential impact of an action before the action takes place.’ ” Neighbors of Cuddy Mountain v. U.S. Forest Serv., 137 F.3d 1372, 1380 (9th Cir.1998) (quoting City of Tenakee Springs v. Clough, 915 F.2d 1308, 1313 (9th Cir. 1990) (emphasis in original)).
The agencies’ actions here are completely contrary to these well-established legal principles. As evident from the foregoing, the agencies did not conduct a “previous, rigorous evaluation” of the proposed cover design via their limited modeling. Maj. Op. at 1150. The majority’s contention that this modeling “satisfied NEPA’s hard look requirement” is belied by the record before this court. Indeed, the majority seems to recognize that myriad lingering questions central to a thorough evaluation of the mine expansion project remain: “Should the testing reveal significant inadequacies or miscalculations in the modeling,” the majority asserts, “the agencies presumably are authorized to, and will require Simplot to, take corrective action.” Id.
It is telling that no legal authority is cited for this procedure. The majority’s approval is especially troubling given that the proposed expansion might extend the life of the mine for another fourteen to sixteen years, a time period in which the full extent of new pollution caused may not even register.[3] When the effects from the expansion become clear, Simplot may be “long gone” — leaving selenium-contaminated waterways responsible for abnormalities in aquatic life, dead livestock, and other destructive consequences in its wake.
Ill
The environmental harm that will result from expanded mining in Smoky Canyon can only be prevented with careful, reasoned evaluations that account for detailed scientific opinions and tailor remedial steps in light of those opinions. The majority’s willingness to accept the flawed and incomplete assessments of the agencies in this case amounts to an abdication of the judicial function. We should hold that the record before this court reveals significant omissions and woefully inadequate assessments of known and unknown problems associated with the proposed cover design; that, absent a comprehensive assessment of existing sources of selenium pollution in the Smoky Canyon area, the remediation efforts necessary to clean up existing pollution Simplot has already created cannot *1159 proceed; and that the agencies’ decision to approve the mine expansion project in light of these deficiencies is arbitrary and capricious and in violation of federal environmental law.
I dissent.

. The majority argues that the agencies’ determination is sound since "the relevant variables reflecting seasonal variations were included [in the modeling] and ... Dr. Carlson’s objections went to the time scale of the model output rather than the input variables.” Maj. Op. at 1152. This obfuscates the issue: namely, that the model's output predictions are not trustworthy in light of the comers cut and limitations Dr. Carlson identified.

. Simplot’s offer to test the proposed cover design further to ensure that it performs as predicted after the mine expansion is underway is another indication that the agencies’ conclusions lack adequate factual bases.

. The agencies concede that it takes ten years for new selenium pollution to register, and for remediation efforts to show any results.