**SIERRA CLUB, a non-profit corporation, Plaintiff,**

v.

**UNITED STATES of America; Department of the Interior; National Park Service; Bruce Babbitt, in his official capacity as Secretary of the Interior; Robert Stanton, in his official capacity as Director of the National Park Service; John Reynolds, in his official capacity as Western Regional Director of the National Park Service; Stanley Albright, in his official capacity as Superintendent of Yosemite National Park, Defendants.**

No. C–98–3213 CRB.

United States District Court, N.D. California.

Oct. 13, 1998.

Stephan C. Volker, Sierra Club Legal Defense Fund, Inc., Julia A. Olson, San Francisco, CA, Joseph J. Brecher, Oakland, CA, for Plaintiffs.

Martin J. Lalonde, USDJ–Environment & Natural Resources Division, Washington, DC, for Defendants.

**ORDER**

BREYER, District Judge.

The National Park Service describes Yosemite as a "premiere masterwork of the natural world." Any change to this masterwork should only take place after there has been strict compliance with all applicable environmental laws. It is in this context that plaintiff Sierra Club asks the Court to halt implementation of Phase One of the Yosemite Lodge Area Development Plan in Yosemite National Park. After reviewing the pleadings, conducting a site visit of the disputed area, and receiving the benefit of oral argument on October 8, 1998, the Court hereby grants plaintiff's motion for preliminary injunction, for the reasons set forth below.

*BACKGROUND*

In January 1997, the Merced River in Yosemite Valley overflowed its banks during a severe flood. This flooding caused substantial damage to buildings in the Yosemite Lodge area, located near the base of Yosemite Falls. Fifty percent of the public lodging facilities and one hundred percent of employee housing were damaged or destroyed.

In response to the flood damage, the National Park Service ("NPS") quickly developed a plan to construct new lodge facilities nearby so that it could continue to accommodate the same number of overnight visitors in the area. In addition to proposing the new facilities, the NPS set out to make other structural changes that it believed would improve the visitor experience in the Yosemite Lodge area.

The present layout of the lodge area is as follows: the accommodations that comprise Yosemite Lodge lie just to the north of the Merced River. Most of the cabins or buildings lie within the 100–year floodplain of the river, many of which were damaged in the

January 1997 flood. Just north of Yosemite Lodge lies Northside Drive, which provides access to the area for both daytime and overnight visitors. Adjoining Northside Drive is a parking lot for cars and tour buses. Further north is the trailhead which begins the hike to Upper Yosemite Falls, approximately 3.5 miles away. Visitors have a view of the falls from the lodge area, although this view is impeded somewhat by the lodge facilities, parking lots, and cars proceeding along Northside Drive.

The lodge development plan crafted by NPS in the wake of the floods envisions substantial structural changes in the area. First, NPS seeks to remove the damaged lodging facilities from the floodplain. Rather than reconstruct the facilities in the same location, where they would remain exposed to potential flood damage, the Park Service seeks to construct new facilities—284 motel rooms, 96 cottage rooms, and 60 cabins—to the north of the current location of Northside Drive, which falls outside the floodplain. In turn, the plan calls for Northside Drive and its adjoining parking lots to be re-routed to the south, closer to Merced River. The Park Service's stated purpose for re-routing the road is to improve views of Yosemite Falls and move traffic further away from the new lodge facilities. Much of the new Northside Drive would be built in the area where the flood-damaged buildings currently rest.

NPS conceived the lodge development plan in the context of the ongoing park-wide planning process that has been in motion for almost 20 years. This process began with the adoption of the 1980 General Management Plan ("GMP"), which sought to guide planning throughout Yosemite National Park. The GMP set forth, in a very broad manner, the Park Service's goals with respect to visitor accommodations, employee housing, concession services, traffic concerns, and several other issues relating to the overall operation of the park. One of the mandates of the GMP was to remove lodging facilities from the Merced River floodplain to avoid potential damage to those facilities. The GMP was accompanied by an Environmental Impact Statement, as required by the National Environmental Policy Act.

NPS adopted another major planning document in 1992—the Concession Services Plan ("CSP"). The CSP amended the GMP, reducing the number of overnight visitors that the GMP sought to accommodate in the park, and making other minor changes to the original plan. The CSP addressed park-wide planning issues in equally broad terms as the GMP. With respect to the Yosemite Lodge Area, the CSP reiterated that facilities would be removed from the floodplain and envisioned construction of new facilities elsewhere. However, the type, number, and location of these new facilities were not specified. As with the GMP, the CSP was adopted after the Park Service issued an Environmental Impact Statement.

In 1996, NPS initiated the Valley Implementation Plan ("VIP"), which seeks to implement the broad directives of the GMP and CSP by detailing, on a site-specific basis, the development projects with respect to visitor accommodations throughout the park. The Park Service decided that it was necessary to conceive these site-specific proposals in the course of one large, park-wide planning process in order to ensure that the overall impact of development within the park could be adequately monitored. The VIP has not yet been completed; the Park Service envisions that a draft will be submitted for public comment some time in the next few months. As with prior park-wide planning documents, the VIP will be accompanied by an Environmental Impact Statement.

Development activities pertaining to the Yosemite Lodge area were originally included in the VIP. However, in the wake of the flood, NPS determined that it needed to expedite the construction process in order to accommodate the number of visitors envisioned in the previous park-wide planning documents. Therefore, it separated the lodge area from the VIP process and crafted the Yosemite Lodge Area Development Plan on an individual basis.

In April 1997, less than four months after the flood, NPS drafted an Environmental Assessment, which set forth an initial version of the plan. In July 1997, NPS issued a Finding of No Significant Impact ("FONSI") which determined that an Environmental Impact Statement was not required for the project. In response to public comments,

NPS issued a modified FONSI, which sets forth the lodge development plan as described above.

Plaintiff challenges the lodge development plan, as described in the modified FONSI, on the grounds that it violates both the Wild and Scenic Rivers Act ("WSRA") and the National Environmental Policy Act ("NEPA"). With regard to the former, plaintiff argues that the plan will harm the Merced River area, which is protected from undue environmental encroachment by the WSRA. With regard to the latter, plaintiff argues that NPS violated NEPA by improperly concluding that an Environmental Impact Statement was not required for the lodge development plan. On these grounds, plaintiff seeks a preliminary injunction to halt Phase 1 of the project, which includes the digging of utility trenches to support the new lodge facilities and the re-routing of a portion of Northside Drive to facilitate the creation of those trenches.[1]

*LEGAL STANDARDS*

To be entitled to a preliminary injunction, a plaintiff must show "either (1) a combination of probable success on the merits and the possibility of irreparable harm, or (2) the existence of serious questions going to the merits, the balance of hardships tipping sharply in its favor, and at least a fair chance of success on the merits." *Miller v. California Pacific Medical Center,* 19 F.3d 449, 456 (9th Cir.1994).

When determining whether the Sierra Club has established a probability that it will succeed on the merits under either their WSRA or NEPA claims, the Court is governed by the Administrative Procedure Act (APA), which sets forth the standard of judicial review of informal (i.e. non-adjudicatory) agency activities. A court may only invalidate such activities if they were undertaken in an "arbitrary and capricious" manner. 5 U.S.C. Section 706(2)(A). Administrative decisions are entitled to a presumption of validity, and "[a]bsent a showing of arbitrary action, [courts] must assume that the agencies have exercised this discretion appropri-

ately." *Kleppe v. Sierra Club,* 427 U.S. 390, 412, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976).

This standard of review is, of course, highly deferential. "Review under the arbitrary and capricious standard is narrow and the reviewing court may not substitute its judgment for that of the agency." *Western Radio Services Co. v. Espy,* 79 F.3d 896, 900 (9th Cir.1996). The court must ascertain "whether the agency's decision was made after considering the relevant factors and whether the agency made a clear error of judgment." *Id.* The court may reverse an agency decision:

> only if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, offered an explanation that ran counter to the evidence before the agency, or offered one that is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *Id.*

*DISCUSSION*

**A. Possibility of Irreparable Harm/Balance of Hardships**

■ There is no presumption of irreparable injury when an agency fails to thoroughly evaluate the environmental impact of a proposed action. *Amoco Production Co. v. Village of Gambell,* 480 U.S. 531, 544–45, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987). However, "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable." If such injury is sufficiently likely, therefore, "the balance of harms will usually favor the issuance of an injunction to protect the environment." *Id.* at 545, 107 S.Ct. 1396.

■ In light of this legal principle, the balance of harms tips in favor of plaintiff here. NPS seeks to initiate construction of lodge facilities and begin building a new road in what the Sierra Club alleges is a violation of federal environmental laws. Plaintiff alleges, and defendant concedes, that archeo-

---

1. More recently, plaintiff filed a supplement to its motion for preliminary injunction, seeking in addition to halt construction of a new sewer line through the lodge area. The Court will address the issues raised by plaintiff's new motion in a separate order.

logical resources may be disturbed during the construction process. Plaintiff also alleges that an area protected by the WSRA will be disturbed in violation of that Act. Finally, plaintiff alleges that substantial questions are raised about the cumulative impact of the lodge plan when considered in relation to other development projects taking place throughout the park. The environmental harm that would be caused by initiation of the construction project cannot simply be erased if plaintiff ultimately succeeds on the merits.

Defendants respond that NPS and the public would also experience undue hardship if the Court were to issue a preliminary injunction, because it would delay completion of the lodge development plan by as much as seven months. As a result, for that period of time, there will not be sufficient lodging space in the area to accommodate the optimum number of park visitors.

The Court recognizes that one of the Park Service's mandates is to provide for the public enjoyment of Yosemite National Park and its scenic resources, and appreciates that a seven-month delay in construction of the proposed lodging facilities will hinder efforts to fulfill this mandate. However, the hardship caused by this seven-month delay must be weighed against the risk of environmental damage to Yosemite National Park. The hardship that would result from such damage is properly summarized in the words of the Park Service itself:

> ... this tiny place on the face of our planet is a premiere masterwork of the natural world. It is of incalculable value to those who seek it and is cherished in the consciousness of those who know it only through works of art and the written word.

Yosemite Valley and the sweep of Sierra wilderness that surrounds it possess superlative scenic grandeur and are a constant test of our wisdom and foresight to preserve them as a treasure for all people. *GMP* at 1.

The balance of hardships therefore tips substantially in favor of plaintiff. The more difficult inquiry is whether plaintiff meets its burden of demonstrating a likelihood of success on the merits.

### B. Likelihood of Success on the Merits

#### 1. Wild and Scenic Rivers Act

Congress designated the Merced River as a protected area under the Wild and Scenic Rivers Act in January 1987. The WSRA establishes a system whereby "certain selected rivers of the Nation which, with their immediate environments, possess outstandingly remarkable scenic, recreational, geologic, fish and wildlife, historic, cultural, or other similar values, shall be preserved in free-flowing condition, and ... protected for the benefit and enjoyment of present and future generations." 16 U.S.C Section 1271.[2]

The WSRA imposes both procedural and substantive requirements on the agencies responsible for administering a designated area. There are two procedural requirements relevant to this suit. First, the agency must prepare a comprehensive management plan ("CMP") for the river segment. This plan must address resource protection, development of land and facilities, user capacities, and other management practices necessary or desirable to achieve the purposes of the Act. The CMP "shall be prepared, after consultation with State and local

---

2. The Act further provides:

wild, scenic or recreational river area eligible to be included in the system is a free-flowing stream and the related adjacent land area that possesses one or more of the values referred to in Section 1271 of this title. Every wild, scenic or recreational river in its free-flowing condition, or upon restoration to this condition, shall be considered eligible for inclusion in the national wild and scenic rivers system and, if included, shall be classified, designated, and administered as one of the following:

(1) Wild river areas—Those rivers or sections of rivers that are free of impoundments and generally inaccessible except by trail, with watersheds or shorelines essentially primitive and waters unpolluted. These represent the vestiges of primitive America.

(2) Scenic river areas—Those rivers or sections of rivers that are free of impoundments, with shorelines or watersheds still largely primitive and shorelines largely undeveloped, but accessible in places by roads.

(3) Recreational river areas—Those rivers or sections that are readily accessible by road or railroad, that may have some development along their shorelines, and that may have undergone some impoundment or diversion in the past. 16 U.S.C. Section 1273(b).

governments and the interested public within 3 full fiscal years after the date of designation." Section 1274(d)(1).

Second, the agency must establish detailed boundaries for the protected area, and make such boundaries available for public inspection. Section 1274(b). Before these boundaries are published, the WSRA establishes default boundaries which "comprise that area measured within one-quarter mile from the ordinary high water mark on each side of the river." Section 1275(d).

Substantively, the requirements of the WSRA are very broad and vest the relevant agency with substantial discretion in its management of protected river areas. The agency is simply required to administer the river "in such a manner as to protect and enhance the values which caused it to be included in said system ..." 16 U.S.C. Section 1283(a). In doing so, the agency is to give primary emphasis to "protecting its esthetic, scenic, historic, archeologic, and scientific features." *Id.* "Management plans for any such component may establish varying degrees of intensity for its protection and development, based on the special attributes of the area." *Id.*

In light of these provisions, Sierra Club raises three challenges under the WSRA to the Park Service's lodge development plan. First, it suggests that the Court should enjoin the project because of the Park Service's failure to adopt a comprehensive management plan ("CMP") for the Merced River area as required by Section 1274(d). Second, plaintiff argues that the entire proposal—the re-routing of Northside Drive, the new parking lots, and the construction site for the new lodges—falls within the quarter-mile scenic river corridor boundary imposed upon NPS by Section 1275(d), thereby rendering the project violative of the substantive requirements of WSRA. Third, plaintiffs imply that even if the lodge construction area does not fall within the river corridor, the new road and parking lots *do* fall within the boundary, and taken on their own violate the substantive provisions of the Act.

*a. NPS failure to adopt a comprehensive management plan*

█ It is undisputed that, almost twelve years after Congress designated Merced Riv-

er as a protected area under the WSRA, the NPS has failed to adopt a comprehensive management plan. However, this failure does not, on its own, grant the Court authority to enjoin NPS's land management activities in the area. As the Supreme Court held in *Brock v. Pierce County,* 476 U.S. 253, 106 S.Ct. 1834, 90 L.Ed.2d 248 (1986), absent a specific statutory grant of power, a court may not enjoin substantive agency activities merely because that agency has failed to comply with a procedural requirement.

*Brock* involved a statute that provided federal grants, administered by the Department of Labor, to programs providing job training for economically disadvantaged persons. *Id.* at 255, 106 S.Ct. 1834. The statute gave the Secretary authority to investigate allegations of misuse of funds by grant recipients, and stated that he "shall" determine the truth of any allegation not later than 120 days after receiving the complaint. *Id.* at 256, 106 S.Ct. 1834. In considering a challenge to an effort by the Department of Labor to recover funds after this period had expired, the Supreme Court noted that although the statute spoke in mandatory language, it did not specify the consequences of a failure to make a final determination within 120 days. *Id.* at 259, 106 S.Ct. 1834. Finding nothing in the statute or legislative history to suggest that the Secretary must be enjoined from recovering grant funds under these circumstances, the Court held that when "there are less drastic remedies available for failure to meet a statutory deadline, courts should not assume that Congress intended the agency to lose its power to act." *Id.* at 260, 106 S.Ct. 1834. The Court went on to point out that a court would have authority to impose the "less drastic remedy" of compelling agency action unlawfully withheld or unreasonably delayed, as contemplated by Section 706(1) of the Administrative Procedure Act (APA).

The Ninth Circuit has applied this reasoning in a case involving facts more closely analogous to the current dispute. In *Idaho Farm Bureau Federation v. Babbitt,* 58 F.3d 1392 (9th Cir.1995), plaintiffs sought to enjoin the Secretary of Interior from designating a species as protected under the Endangered Species Act, on the grounds that he failed to

issue a final ruling within the statutorily-prescribed one year period of the initial proposal to designate that species. *Id.* at 1400–01. Applying *Brock,* the Court ruled that "[a]lthough the statutory term 'shall' suggests that the limits are mandatory, failure of an agency to act within a statutory time frame does not bar subsequent agency action absent a specific indication that Congress intended the time frame to serve as a bar." *Id.* at 1401.

Finally, the Eighth Circuit has applied this reasoning to the WSRA. In *Newton County Wildlife Association v. United States Forest Service,* 113 F.3d 110, 112 (8th Cir.1997) the court held that the Forest Service was not required to suspend timber sales due to failure to complete WSRA plans on time: "because the preparation of WSRA Plans was not a precondition to approving the timber sales, a reviewing court may not enjoin or set aside the sales based upon the failure to prepare the Plans." As with the statutes in *Brock* and *Idaho Farm Bureau,* the court refused to interpret the WSRA as granting courts the power to enjoin agency action for failure to comply with procedural requirements, when no such authorization appeared anywhere in the Act.

The above-cited cases are dispositive of the issue at hand. The WSRA provides no indication that a court may enjoin an agency's land management activities with respect to a wild and scenic river area merely because the agency has failed to timely adopt a comprehensive management plan. A less drastic remedy has been, and continues to be, available. Throughout the twelve years in which the NPS has failed to discharge its procedural obligations under the WSRA, plaintiff has had every opportunity to bring suit under Section 706(1) of the Administrative Procedure Act to require the agency to adopt a CMP. Beyond this, however, there is no remedy available to plaintiffs for this procedural violation.

*b. River corridor boundaries*

Plaintiff next contends that NPS failed to establish the boundaries of the Merced River area as required by Section 1274(b) of the WSRA, and that the agency must therefore be held to the default boundary of one quarter mile from the ordinary high-water mark set forth in Section 1275(d). The consequence of imposing this boundary would be, plaintiff alleges, that the construction site for the new lodges, as well as the new road and parking lots, would fall within the quarter-mile area designated by the statute.

Defendants respond that NPS has established the boundary of the scenic corridor of the Merced River in the lodge area of the Yosemite Valley as the "100–year floodplain, all valley wetlands and meadows, and 1/8 mile on both sides of major waterfall tributaries.". It did so both in the Environmental Assessment prepared during study of the lodge development plan, and its Draft NEPA documents for the park-wide Yosemite Valley Housing Plan. The consequence of this designation would be that the construction site for the new lodges, north of the area where Northside Drive is currently located, would fall outside the scenic corridor.

Plaintiff asserts that because there is "no official publication containing this information," the boundary designation proposed by NPS is not applicable. It is true that Section 1275 contemplates publication of proposed boundaries in the Federal Register, and that the default boundary provision of Section 1275(d) is to apply until such publication. However, when Congress designated the Merced River as a wild and scenic river corridor, it adopted language to override the provisions of Section 1275: "With respect to the portions of the river designated by this subparagraph which are within the boundaries of Yosemite National Park ... the boundaries, classification, and development plans for such portions need not be published in the Federal Register." Section 1274(a)(62)(A). The only requirement of this section is that boundaries be made available for public inspection, a requirement that was satisfied through their inclusion in the Environmental Assessment and the Draft NEPA documents for the Yosemite Valley Housing Plan. Therefore, the Court holds that the NPS designation of the boundaries of the Merced river corridor is controlling.

*c. Substantive requirements of the WSRA*

Although the construction site for the new lodges does not fall within the wild and

scenic river corridor, the question remains whether the proposed re-routing of North-side Drive and the adjoining parking lots violate the substantive requirements of the WSRA.[3]

As mentioned above, NPS is required to manage the river area "in such a manner as to protect and enhance the values which caused it to be included" in the system. Section 1283(a). It is to give primary emphasis to protecting esthetic, scenic, historic, archeologic, and scientific features. Furthermore, "particular attention shall be given to scheduled timber harvesting, road construction, and similar activities . . . ." *Id.* Most importantly, agencies are given discretion to manage a river system with "varying degrees of intensity for its protection and development, based on the special attributes of the area." *Id.*

In light of the discretion granted to agencies under the WSRA, as well as the deferential standard of review courts must apply under the APA, this Court cannot conclude that NPS has implemented the statute in an "arbitrary and capricious" manner. With respect to the WSRA, the Environmental Assessment provided a rational justification for the proposed changes in the river corridor:

"[s]cenic river qualities of the Merced River through the lodge area would be greatly improved as a result of relocating development outside the wild and scenic river management corridor. Specific scenic values that would be improved after relocating development away from the river include views of Yosemite Valley waterfalls and rock cliffs; views of the Merced River and its confluence with Yosemite Creek; and the scenic interface of river, rock, meadow, and forest and views of scenic features. Recreational values that would be improved include photography, hiking and nature study." *EA* at 36.

The above-quoted passage demonstrates that the Park Service, to use the applicable language of the WSRA, considered the "special attributes of the area" when exercising its statutory discretion in drafting the lodge plan. People do not visit the area in question merely to view the Merced River; the location also provides a view of Yosemite Falls and other attractions in the valley, and is a starting point for visitors who wish to go rock climbing or hike to Upper Yosemite Falls. The area is heavily populated by visitors and is one of the most highly developed locations within the park.

The agency has explained that the trade-off for the removal of lodge facilities from the corridor would be the placement of a road within the corridor. The net result of this trade-off is that approximately 7 acres of riparian area will be restored. In addition, the agency envisions that these changes will enhance the overall visitor experience in the Merced River area. In light of the "special attributes of the area" encompassing Yosemite Lodge, as described in the EA above, the Park Service has properly exercised its dis-

---

3. Plaintiff also contends that even if the NPS boundary is controlling, the Court must still consider the impact of the new lodge construction when determining whether the plan complies with the substantive provisions of the WSRA. In support of this contention, plaintiff relies on *Wilderness Society v. Tyrrel*, 918 F.2d 813, 819 (9th Cir.1990), which seems to suggest that land which falls *outside* the scenic river corridor must nonetheless be managed in accordance with the requirements of the Act. It is less than clear, however, how the court reached this conclusion, or whether such a conclusion was necessary to the court's holding. The court appeared to interpret Section 1283(a)—which directs the federal agency with jurisdiction over "any lands which include, border upon, or are adjacent to, *any river* " included within the system—to mean that any agency must manage any lands which border upon, or are adjacent to, any *river corridor* included within the WSRA. Aside from altering the plain meaning of the statutory language, this interpretation would be inconsistent with the entire thrust of the WSRA, which requires the agency to manage rivers and the land falling within the boundary that the agency has determined will define the river corridor. *See, e.g., Newton County Wildlife Association v. United States Forest Service*, 113 F.3d 110, 113 (8th Cir.1997) ("In our view, the plain meaning of that provision limits the planning requirement to the boundaries of the designated river segment, because it is the designated 'segment' that becomes a 'component' of the national system").

On a more fundamental level, as demonstrated below, the lodge development plan is faithful to the substantive requirements of the WSRA. This is so even taking into account the impact of the new lodges, which would be placed much further away from the river than the damaged lodges (which NPS seeks to remove) are currently located.

cretion to manage the river corridor in accordance with the purposes of the WSRA.

Plaintiff relies on the language of Section 1283(a) to suggest that road construction in a scenic river area is prohibited by the WSRA. However, in light of the discretion that the Act grants to NPS in its land management activities, Section 1283 cannot be so interpreted. The agency has discretion to categorize a protected area as "wild", "scenic" or "recreational." Although NPS had previously categorized the Merced River area as "recreational" in light of the substantial human intrusion, the Environmental Assessment for the lodge plan reclassified it as "scenic" in light of its proposal to remove most lodging facilities from the river corridor. A scenic river area is one that is "free of impoundments, with shorelines or watersheds still largely primitive and shorelines largely undeveloped, *but accessible in places by roads.*" Section 1273(b) (emphasis added). The statute therefore does not preclude, in all circumstances, the existence of a road in a river corridor.[4] Rather, the controlling principle is that the agency has substantial discretion to manage the river area, in light of its special attributes, to further the purposes of the WSRA. As discussed above, the agency did not act in an arbitrary or capricious manner in this respect.

In light of the foregoing, plaintiff is unable to demonstrate a substantial likelihood of success for its Wild and Scenic Rivers Act claims. Therefore, the Court cannot enjoin the lodge development plan under this statute.

### 2. National Environmental Policy Act

Plaintiff also seeks a preliminary injunction against the lodge development plan on the grounds that it violates the National Environmental Policy Act. NEPA requires an agency to complete an Environmental Impact Statement (EIS) for a "major federal action significantly affecting the quality of the human environment." 42 U.S.C. § 4332. An EIS is a detailed written statement that evaluates the environmental impacts of the proposed action, the alternatives to the proposed action, the impacts that cannot be avoided should the proposal be implemented, and the irreversible and irretrievable commitments of resources that would occur if the proposed action is implemented. § 4332(C).

In deciding whether a proposed project is a "major federal action" under NEPA, an agency may prepare an Environmental Assessment. 40 C.F.R. § 1501.4(b). The purpose of the EA is to make a brief investigation to determine if "substantial questions are raised as to whether a project . . . may cause significant degradation of some human environmental factor." *Greenpeace Action v. Franklin,* 14 F.3d 1324, 1332 (9th Cir.1992). If the agency concludes through its preparation of an EA that the proposed action will not have a significant effect on the quality of the human environment, the agency issues a "Finding of No Significant Impact" ("FONSI"), and is relieved of the requirement to prepare the more detailed EIS.

In April 1997, four months after the flood, NPS released its draft Lodge Plan EA, which presented two alternatives for public consideration. The "no action" alternative proposed that the flood damaged facilities be rebuilt in essentially the same location, within the flood plain and within the boundaries of the wild and scenic river corridor. *EA* at 11. The "proposed action" called for replacement lodging to be constructed away from the river, the re-routing of vehicular access to the southern perimeter of the new lodge complex (but to the *north* of the current location of Northside Drive), and the relocation of parking areas along this new route. *EA* at 15–16. The EA and other documents quickly dismissed the possibility that lodging could be relocated outside the park area, on the grounds that this alternative would not

---

4. As such, plaintiff's reliance on *Oregon Natural Desert Association v. Green,* 953 F.Supp. 1133 (D.Or.1997) is misplaced. In that case, the District Court invalidated a decision by the Bureau of Land Management to construct new parking lots, make improvements on an access road, and allow cattle grazing in a river area protected under WSRA. However, the Court emphasized that its ruling was primarily based on the fact that the river area had been classified as "wild," meaning that it was to be free of impoundments and generally inaccessible except by trail. *Id.* at 1143–44. In light of this classification, the Court was justified in concluding that the agency action was without rational basis, thus violating the substantive provisions of the WSRA.

conform with park-wide planning documents that had already been adopted. See, e.g., *EA* at 20.

In response to public comments to the EA, NPS made several changes in the proposal. For instance, it responded to objections to placement of the new road to the north of the current location of Northside Drive by deciding instead place it in its present proposed location south of Northside Drive, closer to the river. *Modified FONSI* at 10. It also responded to objections to the placement of the new lodges by moving them further southwest and changing them from four two-story units to two larger three-story units. *Modified FONSI*, at 4.

The final product was the "Modified Finding of No Significant Impact," containing the agency's findings regarding the environmental impact of the lodge development plan. The document concluded, among other things, that the environmental value of the riparian land on which the damaged lodges are located is greater than that of the pine or oak woodland on which the new lodges are to be constructed, *Modified FONSI* at 8–9, that the net land restoration as a result of the project will be 3.3 acres, *id.* at 8, and that although archeological and ethnographic sites would be affected, "standard mitigation measures" would be implemented to minimize this purportedly necessary environmental harm. *Id.* at 2, 12.

The crux of Sierra Club's NEPA challenge to the lodge development plan is that the Park Service improperly avoided the need to prepare an EIS by failing to consider the cumulative impact of the plan—that is, the impact of the plan in connection with other, similar plans being developed throughout the park. Further, plaintiff argues that this failure to consider the lodge development plan on a cumulative basis led NPS to improperly fail to consider reasonable alternatives that might have a lesser impact on the environment. As explained below, plaintiff meets its burden of demonstrating a substantial likelihood of success with respect to these contentions.

*a. Failure to consider cumulative impacts*

The Council on Environmental Quality (CEQ) regulations, enacted pursuant to NEPA, require that an agency must examine a proposed action in the context of other projects when "the action is related to other actions with individually insignificant but cumulatively significant impacts." 40 C.F.R. Section 1508.27(b)(7). An EIS should be prepared "if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by ... breaking it down into small component parts." *Id.* The regulations define a cumulative impact as "the impact on the environment which results from the incremental impact of the actions when added to other past, present, and reasonably foreseeable future actions ...." 40 C.F.R. Section 1508.7.

The Ninth Circuit has spoken extensively on NEPA's requirement that agencies consider individual projects in conjunction with related agency actions. "Where there are large scale plans for regional development, NEPA requires both a programmatic and site-specific EIS. This court has held that where several foreseeable similar projects in a geographical region have a cumulative impact, they should be evaluated in a single EIS." *City of Tenakee Springs v. Clough,* 915 F.2d 1308, 1312 (9th Cir.1990). In *Tenakee Springs,* the court upheld a challenge to an EIS prepared by the U.S. Forest Service concerning old growth timber harvesting in the Tongass National Forest. The agency violated NEPA, the court held, because it failed to consider the impact of the challenged site-specific timber harvesting project in connection with forest-wide harvesting plans: "[t]he effects of such reasonably foreseeable future cutting should have been analyzed in connection with the proposed cutting at issue ...." *Id.* at 1313. *See also City of Carmel–By–The–Sea v. United States Department of Transportation,* 123 F.3d 1142, 1160–61 (9th Cir.1997) (enjoining highway realignment project on grounds that agency failed "to provide any useful analysis of the cumulative impact of past, present and future projects" on wetlands and other natural resources in the area); *LaFlamme v. Federal Energy Regulatory Commission,* 842 F.2d 1063, 1073 (9th Cir.1988) (enjoining construction of individual hydroelectric power project on American River, where agency failed to assess project's impact on the river basin in light of "all past, present and reasonably

foreseeable future actions required in a cumulative impact analysis"); *Thomas v. Peterson*, 753 F.2d 754, 760 (9th Cir.1985) (enjoining Forest Service plan to construct road designed to facilitate timber harvesting, where agency failed to consider the cumulative environmental impact of the road construction and the timber harvesting that the new road was intended to facilitate).

Defendants argue in the face of this case law that NPS did not need to prepare an environmental impact statement because the relevant impacts, both site-specific and cumulative, were considered in prior park-wide planning documents. Defendants refer here to the 1980 General Management Plan—an umbrella document that describes in broad strokes the Park Service's intentions with respect to park maintenance, environmental restoration and protection, transportation, and visitor accommodations within the park—and the 1992 Concession Services Plan, which amends the GMP in certain areas but takes an equally broad approach to NPS activities in the Valley. Defendants argue that because these documents contemplated the kind of project that the NPS currently seeks to implement in the Yosemite Lodge area, and because the documents were adopted in accordance with NEPA, the NPS does not now need to conduct another EIS.

As an abstract matter, defendants are correct that an agency need not revisit environmental considerations that it has already resolved in prior NEPA documents. As the CEQ regulations state:

> [w]henever a broad environmental impact statement has been prepared ... and a subsequent statement or environmental assessment is then prepared on an action included within the entire program or policy (such as a site specific action) the subsequent statement or environmental assessment need only summarize the issues discussed in the broader statement and incorporate discussions from the broader statement by reference and shall concentrate on the issues specific to the subsequent action. 40 C.F.R. Section 1502.20.

However, this language does not relieve the NPS of its obligation to conduct an EIS in the present case, because the cumulative environmental concerns raised by the lodge plan have not been previously addressed. Even if it can fairly be said, as defendants contend, that the lodge development plan is consistent with the prior park-wide planning documents,[5] these prior documents addressed parkwide development and operations in such general terms that they could not possibly have considered the cumulative environmental impacts attendant with the

---

5. It is by no means clear that the lodge development plan is wholly consistent with the GMP and CSP. As discussed above, the plan seeks to remove damaged lodging facilities from the floodplain and construct new facilities elsewhere within the Yosemite Lodge area. Although the GMP is replete with references to the fact that lodging facilities would be removed from the floodplain, nowhere does it contemplate the notion that new lodging facilities will be constructed in the immediate area. In fact, the document states that one of the primary objectives of NPS "will be to restore and perpetuate the natural processes of the park's ecosystems ..." *GMP* at 3. To achieve this objective, NPS expressed its intent "to redirect development to the periphery of the park and beyond." *GMP* at 1. In short, while there is no language in the GMP that explicitly precludes the lodge development plan at issue in this case, the document certainly did not contemplate any construction project in the area—or anywhere else in the park for that matter—with any degree of specificity. It merely discussed, in general terms, the kinds of services and accommodations, and the number of lodging facilities, that would be maintained in various areas throughout the park.

An examination of the CSP, which made adjustments to the broad outline provided in the GMP, also reveals that the type of project envisioned by the lodge development plan was not specifically contemplated. Unlike the GMP, the CSP does specify that new construction would take place in the Yosemite Lodge area, in order to replace facilities that NPS desired to remove from the floodplain. The CSP also states, however, that "[c]reating new disturbance in the valley to relocate lodging structures is not acceptable." *CSP* at 73. Defendants explain that this statement indicates an unwillingness on the part of NPS to initiate construction on "undisturbed areas," and assert that much of the proposed development will take place on "previously disturbed and moderately degraded" woodland. However, defendants concede that the lodge development plan would cause 1.2 acres of previously undisturbed mixed conifer forest to be developed, and admit that this portion of the plan is inconsistent with the CSP. In light of this inconsistency, as well as the general terms in which the GMP and CSP addressed development in the Valley, it is not clear that the lodge development plan is consistent with prior park-wide planning documents.

implementation of site-specific development proposals throughout the park.

The GMP and CSP lay out the goals of the Park Service with respect to the park in very broad terms. For instance, with respect to park operations, the GMP states that its goal is to "maintain a safe, functional, and orderly environment that provides compatible opportunities for resource preservation and enjoyment by visitors and employees." *GMP* at 9. To do this, the plan seeks to "locate facilities to minimize exposure to natural hazards such as rockslides, flooding, avalanche, and hazard trees." *Id.* Specifically with respect to the Yosemite Lodge area, the plan states that NPS would remove cabins from the floodplain but retain 90 cabins and 274 motel units in the area. *Id.* at 37–39. The CSP goes on to contemplate that some construction of lodge facilities would occur in the Yosemite Lodge area. However, neither document specifies how, when, or precisely where such construction would occur. This degree of generality with respect to the lodge area is typical of the documents. *See, e.g., GMP* at 57 ("provide 145 overnight accommodation units by utilizing historic structures and a new structure compatible with the historic district" at Wawona); *GMP* at 59 ("construct a parking area to accommodate 200 autos, 5 buses, tram terminal, and comfort station" in Mariposa Grove); *CSP* at 55 ("at this stage of planning, only the number and general location of structures that would be removed or constructed are known . . . ."). In short, the GMP, as amended by the CSP, is "a programmatic EIS providing management direction and general guidelines" that does not nearly reach the level of specificity required to obviate the need to consider the cumulative impacts of specific development proposals flowing from the general guidelines. *Tenakee Springs,* 915 F.2d at 1313.

Furthermore, NPS is currently engaged in two major park-wide planning projects, both of which involve the preparation of Environmental Impact Statements. First, it is drafting the Yosemite Valley Implementation Plan ("VIP"), which will lay out in specific terms, on a site-by-site basis, the Park Service's plans for visitor accommodations throughout the Yosemite National Park. Second, it is drafting the Yosemite Valley Housing Plan ("VHP"), which will map out plans for the location and construction of employee housing in the valley.[6] The Park Service concedes that it is addressing all other development and management projects in Yosemite National Park on a park-wide basis through these two planning documents, and it is subjecting those documents to an EIS. Only the lodge development plan is being considered separately: "To accelerate flood recovery, the decision was made to separate the development concept planning for Yosemite Lodge from the Valley Implementation Plan." *EA* at 6.

The purpose of the VIP "is to *provide specific steps for carrying out the goals of the 1980 General Management Plan.*" *Draft VIP* at 4 (emphasis added). The plan "proposes a comprehensive approach with detailed actions and a phasing schedule to fulfill the goals" of the GMP. *Id.* The Park Service has insisted that this comprehensive approach to site-specific implementation of the GMP is critical, rejecting the alternative approach of implementing the GMP "on a project-by-project basis without a comprehensive implementation plan." *Id.* at iii. "Because [under this rejected alternative] implementation of current approved plans would be done *on a piecemeal basis and without a comprehensive plan, the acreages to be developed cannot be reliably estimated.*" *Id.* (emphasis added).

This approach clearly belies defendants' contention that NPS may now properly segment the lodge development plan from the parkwide planning process on the grounds that the cumulative environmental impacts have already been considered. If there were no longer a need to consider the cumulative impacts of site-specific development projects, NPS would not have insisted on the creation of another park-wide planning document and accompanying EIS to lend specificity to the broad outlines set forth in the GMP and CSP. As the Park Service acknowledges, the degree of environmental impact caused by

---

6. Originally, NPS included plans to replace the employee housing damaged in the floods in the lodge development plan. However, in response to public comments, it decided to postpone the decision on employee housing and folded the decision back into the park-wide VHP.

park-wide development depends largely on the manner in which the site-specific proposals are implemented.[7] To properly assess this impact, the proposals must be considered on a cumulative basis and an EIS must be prepared. By separating the lodge development plan from the larger development process, NPS has failed to formally consider the cumulative impact of its proposal.[8] There is a substantial likelihood that this failure constitutes a violation of the National Environmental Policy Act.

### b. Failure to consider alternatives

 In addition to considering the cumulative impacts of a project, NEPA requires a federal agency to "study, develop, and describe appropriate alternatives" to a proposed action. 42 U.S.C. Section 4332(E). The CEQ regulations further provide that the agency must "[r]igorously explore and objectively evaluate all reasonable alternatives," stating that this exploration is the "heart" of the NEPA process. 40 C.F.R. Section 1502.14.

Of course, NEPA "does not require the consideration of alternatives whose effect cannot be reasonably ascertained and whose implementation is deemed remote and speculative." *Headwaters, Inc. v. Bureau of Land Management*, 914 F.2d 1174, 1180 (9th Cir. 1990). An agency "is under no obligation to consider every possible alternative to a proposed action, nor must it consider alternatives that are unlikely to be implemented or inconsistent with basic policy objectives." *Seattle Audubon Society v. Moseley*, 80 F.3d 1401, 1404 (9th Cir.1996). Thus, when con-

sidering whether an agency evaluated the appropriate range of alternatives, courts must operate "according to a 'rule of reason,' which governs both which alternatives the agency must discuss and the extent to which it must discuss them." *Tongass Conservation Society v. Cheney*, 924 F.2d 1137, 1140 (D.C.Cir.1991).

Against this backdrop, plaintiffs contend that NPS failed to consider numerous "reasonable" alternatives to the lodge development plan. Among the alternatives suggested by plaintiffs are: 1) a "true" no-action alternative, which would involve abstaining from building replacement facilities within the park altogether; 2) placing whatever lodging deemed necessary within the park in the Curry Village area; 3) placing whatever lodging deemed necessary within the park in the Ahwahnee Hotel complex, the Lost Arrow dormitory complex, or the Lower Tecoya area; and 4) delaying the building of any lodging until all of the issues raised by the Valley Implementation Plan could be publicized, commented upon and responded to.

Defendants' primary response is that these alternatives were quickly dismissed by NPS because they are not "appropriate alternatives" within the meaning of Section 4332(E). The "no new construction" alternative is inappropriate, defendants contend, because the previous park-wide planning documents call for a certain number of visitors to be accommodated in the Yosemite Lodge area, and these goals could not be reached without the construction of new facilities. They cite the NPS statement that a "true" no-action alter-

---

7. As such, this case is distinguishable from *Headwaters, Inc. v. Bureau of Land Management*, 914 F.2d 1174 (9th Cir.1990), which defendants cite in support of their argument that a site-specific EIS need not be completed. In that case, BLM had prepared a region-wide EIS to examine the impacts of timber-harvesting, and opted not to prepare a supplemental EIS for the sale of a small portion of these resources. Plaintiff challenged this decision on the grounds that the agency failed to consider, *inter alia*, that "the cutting in the sale area will affect streams and watershed through increased sedimentation, temperature changes, bank erosion, debris torrents, decreases in pools, and the use of fertilizers and pesticides." *Id.* at 1178. The court rejected this challenge, holding that the agency had *already specifically considered these impacts* in its region-wide EIS. *Id.* Here, by contrast, the

region-wide EIS did not consider the impacts that would arise from the development and implementation of site-specific development projects. The Park Service has admitted as much in its Draft Valley Implementation Plan.

8. Although the Park Service envisions substantial coordination between the formulation of the VIP and the implementation of the lodge development plan, the fact remains that it seeks to move the lodge development plan forward *before* completion of the VIP and its accompanying Environmental Impact Statement. The requirements of NEPA are not satisfied when an agency withholds formal consideration of the cumulative impacts of an action until *after* that action has taken place. *See, e.g., Tenakee Springs*, 915 F.2d at 1313.

native "would be a new direction away from that of the General Management Plan and Concession Services Plan, which have been through extensive public processes." *EA* at 20. With regard to Sierra Club's suggestion that the new facilities be placed elsewhere in the park, defendants respond that these proposals are mere variations on the "true" no-action alternative, because they would be inconsistent with the number of accommodations per area set forth in the GMP and CSP. In short, defendants contend that any alternative inconsistent with prior park-wide planning documents is inappropriate and need not be considered.

Defendants' reasons for the refusal by NPS to consider the above alternatives are unsatisfactory. What the Park Service failed to acknowledge is that the damage caused by the 1997 flood gave rise to new circumstances not contemplated by the prior planning documents. In light of this change in circumstances, it would have been reasonable to consider alternatives that do not comply with the precise letter of the GMP.

Indeed, defendants acknowledge that the lodge development plan *itself* is a "new direction away" from the GMP and CSP. Although the CSP contemplates that some degree of construction would take place in the area, it states forcefully that "[c]reating new disturbance in the valley to relocate lodging structures is not acceptable." *CSP* at 73. Defendants claim that this statement merely prevents the Park Service from developing "undisturbed land", while allowing for development on land that has been previously been disturbed but is currently in the process of being restored to its natural state. Even if this interpretation of the CSP is correct, defendants concede that the lodge development plan would cause 1.2 acres of previously undisturbed mixed conifer forest to be developed, and admit that this portion of the plan is inconsistent with the CSP. After proposing a project that is inconsistent with prior planning documents, NPS cannot now turn around and pronounce "unreasonable" any alternative that is also inconsistent with these documents.

The recent case of *Alaska Wilderness Recreation and Tourism Association v. Morrison*, 67 F.3d 723 (9th Cir.1995), suggests that, under these circumstances, NPS was not permitted to dismiss alternatives merely on the grounds that may have been inconsistent with the GMP. In that case, the Forest Service had adopted a regional EIS for Tongass National Forest which was constrained by a 50–year timber sales contract with Alaska Pulp Corporation (APC). Subsequent to the adoption of the EIS, APC canceled its contract, and the Forest Service opened the harvest area that had been covered by the contract to new bids from other lumber companies. *Id.* at 725. The Service contended that it could not consider alternatives unrelated to timber harvesting, because it was constrained by the prior EIS, which had contemplated timber harvesting in the area. The court rejected this argument, holding that the Forest Service had violated NEPA:

> While we cannot predict what impact the elimination of the APC contract will have on the Forest Service's ultimate land use decisions, clearly it affects the range of alternatives to be considered. Because consideration of alternatives is 'the heart of the environmental impact statement,' 40 C.F.R. Section 1502.12, we hold that the cancellation of the APC contract, which opened for consideration alternatives which could not be freely reviewed when the APC contract was in force, is an event requiring serious and detailed evaluation by the Forest Service. *Id.* at 730.

Here, the 1997 floods created a situation that was not contemplated by the GMP. That document operated under the assumption that a much greater number of lodging facilities would exist in the area. The floods, however, rendered this assumption inoperative. This change in circumstances "opened for consideration" alternatives that NPS may not have previously been able to adopt.

NPS's failure to consider reasonable alternatives flows from its improper decision to remove the lodge development plan from the park-wide Valley Implementation Plan. Had the agency addressed the development needs of the Yosemite Lodge area cumulatively with other visitor accommodation projects throughout the valley, the decision-making process would undoubtedly have been more amenable to consideration of the alternatives discussed above. In any event, considering

the extraordinary circumstances that gave rise to the lodge development plan, the alternatives identified above were reasonable, notwithstanding their potential inconsistency with park-wide planning documents.

Therefore, because NPS failed to consider the cumulative impact of the lodge development plan, as well as several reasonable alternatives to that plan, plaintiffs have demonstrated a substantial likelihood of success with respect to their NEPA claims.

*CONCLUSION*

Plaintiff fails to demonstrate a substantial likelihood of success on its WSRA claims. However, because plaintiff succeeds in demonstrating a likelihood of success on its NEPA claims, and because the balance of hardships tips substantially in favor of plaintiff, the motion for preliminary injunction is hereby GRANTED. The parties are instructed to file simultaneous briefs by October 19, 1998 to assist the Court in determining the nature of the security to be posted by plaintiff pursuant to FRCP 65(c).

**IT IS SO ORDERED.**